John HAKE, Appellant,

v.

Frank GUNTER; Charles Black; Ronald Bartee; Carolos Alvarez; Doris Collins; and Mary Wiesman, Appellees.

No. 86–1510.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1987.

Decided July 15, 1987.

---

James A. Snowden, Lincoln, Neb., for appellant.

Sharon M. Lindgren, Asst. Atty. Gen., Lincoln, Neb., for appellees.

Before FAGG, BOWMAN and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

John Hake, an inmate in custody of the Nebraska Department of Correctional Services ("DCS"), appeals from the district court judgments and orders dismissing his claim under 42 U.S.C. § 1983. Frank Gunter, the DCS director, is the sole appellee.[1] Hake claims that he had a constitutionally protected liberty interest in continued participation in Nebraska's post care work detail program, and that his summary removal from the program violated his right to

---

1. Although Hake also sued the warden of the Nebraska State penitentiary and various Nebraska Board of Parole members, these defendants were dismissed during trial and are not parties to this appeal. Hake does not challenge their dismissal.

due process. Additionally, Hake claims that he had a liberty interest in his community custody classification, and that the summary revocation of this status also violated his due process rights. We affirm on the classification issue, but reverse and remand this case for further proceedings on the work detail liberty interest claim.

## I. FACTS AND PROCEDURAL HISTORY.

In 1968, Hake was convicted of second degree murder. While intoxicated, he had shot and killed his wife. Hake received a life sentence, which he presently is serving in the Nebraska penal system.

On April 4, 1984, Hake was transferred to the Air Park Annex to the Lincoln Community Correctional Center (the "Correctional Center"). The Annex, which has no fences, armed guards, bars or cells, is one of Nebraska's post care centers which houses inmates who have achieved a community custody classification status. An inmate's custody status is determined according to an evaluation process using a point system which is governed by a classification manual. At the time he was transferred to the Annex, Hake had a "Community A" custody classification.

While at the Annex, Hake was assigned to the park crew work detail. The work detail program, like educational release and work release, is a post-institutional care program. Assignments to these programs are determined by an inmate's custody classification level. There are, however, differences between the work detail and the work and educational release programs.[2] By November of 1984, Hake had attained a "Community B" custody classification.

On January 5, 1985, Paul Kreider's wife was found murdered. At the time, Kreider had been on furlough from work detail at the Correctional Center. Kreider was subsequently found dead in California, having committed suicide. This incident caused substantial criticism of the operation of Nebraska's post care community-based programs. As a result, on January 7, 1985, Gunter met with DCS employees and members of the Nebraska Board of Parole to discuss the situation. At the meeting, it was decided that reviews should be made of those inmates receiving furloughs and assigned to the post care facilities. Accordingly, the institutions were asked to compile lists of inmates receiving furloughs who had been convicted of sex crimes or crimes involving the taking of a life.

In mid-January, Gunter and other individuals met to review the parole board files of fifty-seven such inmates. On January 15, 1985, following these reviews, five inmates including Hake were summarily removed from work details and transferred to administrative detention at the Diagnostic and Evaluation Center, a maximum security facility, for psychological evaluation. The inmates did not receive an explanation or reason for their removal, but did receive a "Notice of Administrative Detention Hearing" form.

Subsequently, three of the inmates were returned to the post care center, and a fourth was transferred to another facility after committing a major infraction. Meanwhile, Hake underwent custody classification review on February 1, 1985. Hake received the same custody classification score (Community "B") that he received prior to his removal. The evaluating officer noted that Hake was returned "by ad-

**2.** During the time Hake was on outside work detail, the governing classification manual provided that inmates assigned to work detail could be housed either inside or outside the external perimeter of a security institution. In order to be assigned to outside work detail, the inmate had to have, among other things, a community custody level "A" classification. These inmates were always supervised, and could perform jobs for various public entities outside the institution. Assignment to work detail did not require the Nebraska Board of Parole's approval.

In contrast, inmates assigned to work or educational release had to meet higher criteria, including the attainment of a community custody level "B" classification. These inmates were permitted to live in a community facility outside the external security perimeter and to work unsupervised in the community. Additionally, the initial assignment to either program had to be approved by the Board of Parole.

ministrative decision in view of current offense [and] public concern over recent events," and that no disciplinary action was in process.

After completing this re-evaluation process, Hake was briefly transferred to the Nebraska State Penitentiary's Trustee Dormitory, a minimum and community custody facility. On May 3, 1985, Hake filed the instant suit. Service was ordered on the defendants on June 4, 1985. On June 15, 1985, Hake was transferred to more restrictive custody at the Correctional Center, and his community custody classification status was summarily lowered to "Minimum B."

At no time did Hake ever receive a hearing with respect to his removal from work detail or the revocation of his community custody status.

Hake's four-day bench trial commenced on January 7, 1986. On February 21, 1986, the district court issued a judgment and order, and an accompanying memorandum. The court held that neither the Nebraska statutes nor the DCS rules created a liberty interest in Hake's remaining on outside work detail. The court, however, held that Hake did have a liberty interest in his community custody classification. The court found that the interest was created by the new classification manual, which was adopted in June of 1985 and which expressly required that an inmate with either minimum or community custody status be given notice and a hearing before demotion of that classification. For relief, the court ordered Gunter in his official capacity to reinstate Hake's community status and to provide Hake with the requisite due process measures. The court assessed damages against Gunter in his individual capacity.

Subsequently, Gunter moved to alter or amend the judgment and order on the ground that the sole issue before the district court at trial was whether Hake had been deprived of a liberty interest because of his summary removal from work detail in January 1985. Gunter argued that the new classification manual, upon which the court based Hake's liberty interest in his

community status, was introduced and admitted at trial for the limited purpose of determining the relief available to Hake.

In its memorandum and order dated March 20, 1986, the court expressed its agreement with Gunter's position. After having reviewed the relevant parts of the trial transcript, the court noted that it had stated at trial that the manual was to be received "for purposes of relief only." The court thus concluded that the only issue before it at trial was Hake's alleged liberty interest in work detail, which it had denied. Accordingly, the court ordered the prior judgment in favor of Hake vacated and ordered entry of judgment in favor of Gunter.

Thereafter, Hake moved the court to amend the pleadings to conform to the evidence in accordance with Fed.R.Civ.P. 15(b), in an effort to respond to the court's March 20 order. Hake also moved the court to vacate its March 20 order and to grant a new trial. The district court denied all of these motions.

Hake appeals from all of the above rulings. We address Hake's removal from work detail and his classification demotion separately.

## II. DISCUSSION.

### A. Liberty Interest in Remaining on Post Care Work Detail.

■ The due process clause of the fourteenth amendment protects liberty interests arising from the Constitution itself and those created by state law. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983) (citing *Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–39, 49 L.Ed.2d 451 (1976)). In this appeal, Hake does not contend that his liberty interest in continued participation in the post care work detail program is derived from the due process clause itself, and indeed, although the Supreme Court has never addressed this specific issue, we agree with the views of the Eleventh Circuit that such an argument would be dubious in light of recent decisions of the Court. *Whitehorn v. Harrelson*, 758 F.2d

1416, 1420–22 (11th Cir.1985) (rejecting inmate's claim that continued participation in Alabama's work release program was a liberty interest inherently protected by the due process clause); *see Olim v. Wakinekona,* 461 U.S. 238, 244–48, 103 S.Ct. 1741, 1744–46, 75 L.Ed.2d 813 (1983) (interstate prison transfer is not a liberty interest arising under the Constitution); *Hewitt,* 459 U.S. at 466–68, 103 S.Ct. at 868–69 (no constitutional right of prisoner to be confined in general population rather than more restrictive setting); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979) (no "constitutional or inherent right" to parole); *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) (no constitutional right protecting inmate against transfer to different prison facility); *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538 (no constitutional right protecting an inmate against transfer from less secure to more secure facility); *but see Vitek v. Jones,* 445 U.S. 480, 494, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (involuntary transfer from prison to mental hospital is a liberty interest inherently protected by the due process clause); *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759, 36 L.Ed.2d 656 (1973) (constitutionally protected liberty interest in probation revocation); *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (constitutionally protected liberty interest in parole revocation).

■ Nevertheless, it is clear that a state may create a constitutionally protected liberty interest through enactment of statutes, *e.g., Hewitt,* 459 U.S. at 470–71, 103 S.Ct. at 870–71, or through other forms of state action. *E.g., Vitek,* 445 U.S. at 489–90, 100 S.Ct. at 1261–62 (state regulations and practice created liberty interest); *Dace v. Mickelson,* 816 F.2d 1277, 1279 (8th Cir. 1987) (en banc) (state rules, regulations, or practices may create liberty interest). Under this umbrella, Hake contends that the DCS rules, regulations, policies and practices created a liberty interest in not being removed from work detail without the appropriate procedural due process. In holding to the contrary, we believe the district court erred.[3]

In *Parker v. Corrothers,* 750 F.2d 653 (8th Cir.1984), after reviewing leading Supreme Court cases and Eighth Circuit law, this court concluded that two standards determine whether an inmate has a state-created constitutionally protected liberty interest in obtaining parole: "(1) does the statute contain particularized substantive standards or criteria which significantly guide parole decisions; and (2) does the statute use mandatory language similar in substance or form to the Nebraska statute's language in *Greenholtz?*" *Id.* at 656. We recently affirmed the continuing validity of these standards and their application to state rules, regulations and practices. *Dace,* 816 F.2d at 1279.

■ Although the situation at bar involves *revocation* of a given right rather than *entitlement* to a right as in *Dace* and *Parker,* a distinction developing relevance later in our opinion, we believe Hake's claim must be analyzed under the above standards. Thus, the precise issues are: (1) Do the Nebraska DCS rules, regulations, policies and practices concerning transfer or removal from work detail contain particularized substantive standards or criteria which significantly guide the deci-

---

**3.** In holding that Hake did not have a liberty interest in remaining on work detail, the district court based its decision on both the Nebraska statutes governing prisoner transfers, which seem to give the DCS director great power in this area, *and* the DCS rules. *Hake v. Gunter,* No. CV85–L–264, slip op. at 3, 8 (D.Neb. Feb. 21, 1986) (unpublished). The statutes, however, are not directly at issue in this appeal; Hake's contention is based solely on the DCS promulgations. Although we believe that a liberty interest may be created by state rules and regula-

tions meeting the two-part *Parker* test, despite the existence of apparently relevant state statutes, *see Clark v. Brewer,* 776 F.2d 226, 230–31 (8th Cir.1985), the district court may wish to consider on remand how the statutes fit into the entire work detail scheme. The district court implicitly indicated that it shared our belief when, although first finding that the statutes did not create the interest, it proceeded to analyze whether the DCS rules and regulations created the interest.

sionmaker; and (2) do these same rules, etc., use mandatory language similar in substance or form to the Nebraska statute's language at issue in *Greenholtz?*

In holding that the DCS rules did not create the alleged liberty interest, the district court discussed various relevant DCS rules and regulations. Upon careful examination of the court's analysis, however, it becomes apparent that the court placed a great deal of emphasis on parts of rules dealing with assignment to work detail or the process by which an inmate receives a certain custody classification status.[4] The issue in this case, however, is not whether Hake had a liberty interest in assignment to work detail or in the initial designation of a specific custody status; he already had received these rights. Rather, the issue is whether the DCS promulgations created a liberty interest in the *revocation* of Hake's participation in the work detail program. This is not a distinction without a difference, as alluded to previously, but is a crucial fact distinguishing Hake's claim from those of inmates in cases such as *Greenholtz, Dace,* and *Parker,* whose claims were based on the initial decision to be granted parole. As the Supreme Court pointed out in *Greenholtz,* "[t]here is a crucial distinction between being deprived of a liberty one has, as in parole [or here, as in work detail], and being denied a conditional liberty one desires [as in the initial decision to grant parole, or here, as in the initial decision to assign an inmate to work detail]." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. at 2104. We believe the court failed to constrain itself to the precise issue at hand, resulting in a flawed analysis and presumably resulting in the court's second area of error.

In addition to focusing on the aforementioned rules in denying Hake's claimed liberty interest, the court also focused almost exclusively on one section of the classification manual in effect at the time of Hake's removal: Section IX, entitled "Movement/Transfer of Inmates." Section IX states: "Generally, movements are initiated as a result of a change in security and/or custody needs of the inmate." This section then lists the various types of movements and criteria utilized. The court found that because the term "generally" was used, the list that followed was "not exhaustive of all types of transfers allowed." *Hake,* No. CV84–L–264, slip op. at 8. Impliedly, then, the court held that the rule did not meet the first standard of the *Parker* test.

Although Section IX may be relevant to Hake's claim, in focusing on this promulgation the court totally ignored parts of two other policies which have a seemingly more direct bearing on the issue: Operational Memorandum 400.7.9/1, entitled "Post Care Detail Crew(s)" (Tr. Ex. 62), a part of which specifically discusses "Removal from Detail" (Part F); and DCS Rule 6, entitled "Adult Offender Discipline" (Tr. Ex. 4), which sets out, in subsection 14, the procedure for placing an inmate in administrative detention. Our examination of these policies indicates that they may in combination meet the *Parker* standards for creation of a constitutionally protected liberty interest in removal from work detail. *See Clark v. Brewer,* 776 F.2d 226, 231 (8th Cir.1985) (combination of policies created liberty interest). Because, however, the district court is in a far better position to determine how these policies fit into the entire regulatory scheme, we believe the most appropriate solution is to reverse and remand this case to the district court for further proceedings.

In analyzing the rules and regulations on remand, the court should focus on those

---

**4.** For example, the court discussed: (1) DCS Rule 9 (Tr. Ex. 4), which relates to the *availability* of post-care programs to qualified inmates, *Hake,* No. CV85–L–264, slip op. at 3; (2) Section V of the classification manual in effect at the time Hake was removed from work detail (Tr. Ex. 1), which pertains to the *assignment* to post-care programs of an individual who has attained community custody status, *id.* at 5; (3) the "Procedure" section of Administrative Regulation 209.2 (Tr. Ex. 70), which states that temporary release opportunities "shall be *provided*" to qualified offenders, *id.* at 6 (emphasis added); and (4) Section III of the classification manual (Tr. Ex. 1), which states that *assignment* of an inmate to a specific institution requires consideration of management variables. *Id.* at 7.

promulgations specifically dealing with an inmate's removal from work detail, and should carefully consider the relevance of the two aforementioned policies.[5] We do not mean to imply one way or another as to the existence of the alleged liberty interest, but believe that because the district court has heard all the evidence in this case, it is more capable of fitting all the pieces of the puzzle together.

**B. Classification Demotion Issue.**

■ Hake also contends that the district court erred in vacating the judgment against Gunter after the court initially ruled that Hake had a liberty interest in his community custody status. Specifically, Hake argues that the court erred in refusing to receive Exhibit 2, the new classification manual effective as of June 1985, as substantive evidence of that interest. Alternatively, Hake contends that the court erred in denying his motion under Fed.R. Civ.P. 15(b) to amend the pleadings to conform to the evidence. We cannot agree with either contention.

In his post-trial motion to vacate the court's initial judgment in favor of Hake, Gunter argued that the sole issue before the court was whether Hake had a liberty interest in his January 1985 removal from work detail. In granting Gunter's motion, the district court, after reviewing that part of the trial transcript pertaining to Gunter's objections to Exhibit 2, concluded that it had admitted the new manual solely for purposes of relief. The court therefore held that the issue of whether Exhibit 2 created a liberty interest in Hake's community custody status was not properly before it at trial, and ruled it would amend the judgment accordingly. The court further held that a broadly-worded statement of

the liberty interest issue in the pretrial order did not negate its finding that the sole liberty interest at issue at trial was that of Hake's transfer from work detail.

A review of the entire trial transcript and record convinces us that Exhibit 2 was indeed admitted only for purposes of relief, and that the sole issue at trial was whether Hake had a liberty interest in his removal from work detail. Therefore, based on the reasoning in its March 20 memorandum, we hold that the district court did not err in vacating the judgment against Gunter.

■ Hake further contends that the district court erred in not granting his subsequent motion to amend the pleadings to conform to the evidence. Although recognizing that Fed.R.Civ.P. 15(b) encourages such amendments whenever issues not raised by the pleadings are tried by express or implied consent of the parties, the court held that the June 1985 classification demotion was not so tried. Moreover, although Hake suggested the court could reopen the case to permit evidence on the issue, the court felt that such a course of action would not be in the best interests of justice. The court therefore denied Hake's motion.

Once again, a careful review of the trial transcript convinces us that the court did not err. Although at trial Hake developed some testimony related to the classification demotion issue, Gunter, apparently believing the issue was not before the court, did not present any evidence relating to the June 1985 demotion. As pointed out by Gunter, Hake is free to file another lawsuit and thus has not been prejudiced by the court's decisions. On the other hand, it would have been extremely prejudicial to Gunter to have been found guilty of violat-

---

5. In addition to arguing that these two policies supported a finding that a liberty interest existed, at oral argument Hake also relied upon parts of the old classification manual (Tr. Ex. 1) and Administrative Regulation 209.2 (Tr. Ex. 70). On remand, the district court should consider how parts of these promulgations, other than those parts pertaining to assignment to work detail or the initial custody classification designation, fit into the entire picture. The court should also consider the role played by

DCS Rule 6(10)(e) (Tr. Ex. 4), which permits transfer of a post care "resident" only for discipline or reclassification. Finally, if the court still concludes that no liberty interest exists, we feel it would be beneficial to explain how the regulatory scheme at bar differs from that in *Williams v. Benson*, No. CV82–L–413 (D.Neb. Oct. 24, 1983) (unpub. opinion), where the court held that a Nebraska inmate had a liberty interest in retention of the work *release* privilege.

ing Hake's constitutional rights on an issue of which he had no knowledge or on which he presented no evidence. Accordingly, we hold that the district court did not err in denying Hake's Rule 15(b) motion.

## III. CONCLUSION.

Based on the foregoing analysis, we affirm the district court orders vacating the judgment against Gunter and denying Hake's motion to amend the pleadings. We reverse and remand to the district court for further proceedings consistent with this opinion the issue of whether Hake had a constitutionally protected liberty interest in his removal from work detail.